**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| MEAGHAN RICHARDSON, CYRIL RICHARDSON, | CIVIL CASE NO. 3:08cv0144-CVG-GWC |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | Action Filed : November 20, 2008 |
| THE ATTORNEY GENERAL OF THE BRITISH VIRGIN ISLANDS, RANDY DONOVAN, | Hearing Dates: February 22 and 27, 2017<br>Dept.: STT Courtroom 3 |
| Defendants. | |

**I.**

**PLAINTIFFS' POST-EVIDENTIARY HEARING BRIEF**

Plaintiffs, MEAGHAN RICHARDSON and CYRIL RICHARDSON, ("Plaintiffs" or "Richardsons") respectfully submit the following post-trial brief following the Evidentiary Hearing in the above matter conducted on February 22 and 27, 2017.

**I.**

**ISSUE TO BE DETERMINED AND BURDEN OF PROOF**

The issue before this Court is to determine the location of the accident involving Plaintiffs, which will determine whether Foreign Sovereign Immunity Act ("FSIA") jurisdiction exists. (*See, Richardson v. Donovan,* 2016 U.S. App. LEXIS 22250, *7 (3rd Cir. 2016). The Courts have established a framework to determine if FSIA jurisdiction exists. See 28 U.S.C.A. § 1605(a)(5).[1]

---

[1] The FSIA provides that foreign sovereign immunity is not available in any case:

> . . . not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state *for personal injury* of death, or damage or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the

(continued...)

1  The rules the Court must apply are as follows:

2  A defendant must initially establish that it is a foreign state. There is no dispute here that
3  Defendant is a foreign state.

4  During the first phase, the plaintiff is required to come forward with some evidence that an
5  exception under FSIA exists. *Rodriguez v. Transnave Inc.,* 8 F.3d 284, 287 fn. 6 (5th Cir. 1993)
6  ("once it demonstrated that it is a foreign state, the burden shifted to Rodriguez to raise the
7  exceptions to sovereign immunity and assert at least some facts that would establish the
8  exceptions").

9  If a plaintiff comes forward with "at least some facts that would establish the exception," then
10 the foreign state defendant has the burden of proof to show that the exception does not apply. *Stena*
11 *Rederi AB v. Comision De Contratos Del Comite,* 923 F.2d 380, 390, fn. 14 (5th Cir. 1991) ("Of
12 course, the party seeking immunity bears the ultimate burden of proving the nonapplicability of the
13 exceptions raised by its opponent").

14 The burden of proof of a plaintiff seeking to overcome immunity is to establish "some facts"
15 that would establish the exception. *Rodriguez* at 287, fn. 6. This is a burden of production which is
16 satisfied once *some facts* are produced. Once plaintiff produces *some facts* to establish the exception
17 to immunity, the burden the shifts to the Defendant which has the ultimate burden of persuasion.
18 *City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 369 (2d
19 Cir.2006).

20 During this second phase, once the burden shifts, the foreign state's evidence must be greater
21 than the evidence establishing the exception. The foreign state has the ultimate burden of persuasion.

22 The evidence that was presented at the Evidentiary Hearing was that both Plaintiffs and Mr.
23 Uzenski testified the interception and the collision occurred in U.S. waters; whereas the Defendant's

---

[1](...continued)
scope of his office or employment, . . .

28 U.S.C.A. § 1605(a)(5) (emphasis added).

witnesses, Officers Donovan and Poole, both testified the interception and collision occurred in BVI waters. There are competing versions of the evidence. If the Court cannot determine which side's evidence preponderates so that the evidence on both sides is equal in the mind of the trier of fact, the foreign state has failed to meet its burden of persuasion and the issue is to be decided in favor of the Court having jurisdiction.

## II.

## STATEMENT OF FACTS

On December 1, 2007, Plaintiffs Meaghan and Cyril Richardson were passengers on a powerboat named "Guilt Trip" owned by Ryan Uzenski. Other passengers included Kelly O'Brien, Benjamin Craddock and Brendan Day. The group, with the exception of Mr. Day, was at the St. Thomas Yacht Club and decided to go to meet Mr. Day in St. John. The group had dinner in St. John. Shortly after 8:00 p.m., the group, including Mr. Day, left Cruz Bay in "Guilt Trip" and traveled east. Once the group reached the eastern end of St. John, there was a discussion as to whether the group would go to Skinny Legs in Coral Bay, St. John or to the Willie "T" at Norman Island, British Virgin Islands. The group decided to go to the Willie "T".

Guilt Trip was intercepted by British Virgin Islands ("BVI") customs. At February 22, 2017, hearing, Plaintiff Cyril Richardson testified that the interception occurred 200 to 300 feet due north of Flanagan Island and within U.S. waters. (Reporter's Transcript "RT" - 2/22/27, 25:7 - 27:6; 27:15 -30:25). Plaintiff Meaghan Richardson confirmed that the interception occurred in U.S. Waters a couple hundred feet due north of Flanagan Island. (RT - 2/22/27, 98:24 - 100:18). Ryan Uzyneski offered similar testimony that the interception occurred a few hundred feet due north of Flanagan Island. (RT - 2/22/27, 110:13 - 23; 115:3 - 13).

After being intercepted, the vessels were tied up to each other while the BVI Customs Officers questioned the group. The BVI Customs Officers instructed the Plaintiffs to board the Customs Vessel to be taken to Roadtown, Tortola, BVI, to speak to the officers' supervisor. All complied. (RT- 2/22/27, 39:16 - 40:13).

Plaintiffs were standing behind the captain of the Customs Vessel, Randy Donovan when he was trying to get the Customs Vessel on plane. The Customs Vessel was trimmed too high and the

vessel could not get on plane. Mr. Donovan told Plaintiffs to go forward to shift the weight distribution of the vessel in order to get the vessel on plane. Plaintiffs moved to the area in front of the center console. While Mr. Donovan was looking backwards, he advanced the throttles to the full open position and headed his vessel directly into Mr. Uzenski's vessel. Mr. Donovan caused the Customs Vessel to collide with "Guilt Trip" at a high rate of speed. Mr. Richardson estimated that the collision occurred within 30 seconds to a minute after the vessels separated and that the customs vessel had traveled four hundred feet at the most. (RT-2/22/27, 42:22 - 45:15).

At the hearing on February 22, 2017, Plaintiff produced the testimony of Cyril Richardson, Meaghan Richardson and Ryan Uzenski that the interception and collision both occurred in U.S. Waters. Plaintiffs then rested.

On February 27, 2017, Defendant BVI offered testimony of two of the three customs officers that intercepted Guilt Trip. Officer Donovan testified that the interception was "approximately a half mile from The Bite". (RT-2/27/17, 11:10:12). Officer Osbert Poole testified that the intercept occurred on the south side of The Indians prior to The Bite. (RT-2/27/17, 65:6 - 66:18).

BVI did not produce any other percipient testimony regarding the location of the intercept or the location of the accident.

### III.

### DOCUMENTARY EVIDENCE ADMITTED

During the evidentiary hearing, there were a total of three documentary exhibits admitted. Plaintiff's Exhibits 1 and 2 were admitted on February 22, 2017. (RT - 2/22/27, 94:2-8). These two Exhibits consisted of a chart of the area of where the accident took place (Exhibit 1), and a chart depicting the border between the U.S. and the British Virgin Islands ("BVI") (Exhibit 2). Defendant's Exhibit 28 was introduced on February 27, 2017. (RT - 2/27/17, 135:12-22). Exhibit 28 is a chart for the Virgin Islands, Road harbor to Capella Island. These three Exhibits were the only exhibits admitted into evidence.

The Court also called a witness to assist the Court, William Hudson, a marine interdiction agent with United States Customs and Border Protection, Air Marine Operations, St. Thomas Marine Unit. Agent Hudson assisted the Court by marking Exhibit 20 (which was not formally admitted)

- 4 -

to show the border between the USVI and the BVI in relation to the coordinates of the accident.

## IV.

## TESTIFYING WITNESSES

The following persons were called as witnesses and provided the Court with testimony:

Cyril Richardson (Plaintiff)

Meaghan Richardson (Plaintiff)

Ryan Uszenski (Percipient witness - owner/operator of Guilt Trip)

Randy Donovan (BVI - Customs Agent)

William Hudson (Marine Interdiction Agent called by Court)

Osbert Pole (BVI- Customs Agent)

Anantharaman Balasubramanian (BVI - testify as to US/BVI border)

Jennifer King-Grate (BVI Police Force)

Tiffany Scatliffe Espirit (BVI Notary)

Annette Williams Sylvester (BVI Magistrate's Court manager)

## V.

## PLAINTIFFS HAVE MET THEIR BURDEN OF PRODUCTION THAT THE INCIDENT OCCURRED WITHIN THE US WATERS

The testimony of Meaghan Richardson, Cyril Richardson and Ryan Uszenski was consistent that on December 1, 2007, they were leaving St. John on a powerboat named "Guilt Trip" owned by Ryan Uzenski, and were traveling east along the north side of St. John, at all times within US waters. Due north of Flanagan Island, they saw two blue lights flashing. Believing the blue flashing lights to be a United States Customs Enforcement vessel, Mr. Uzenski powered down "Guilt Trip." The vessel turned out to be a British Virgin Islands Customs Vessel. The facts presented by Plaintiffs were that both the interception and the collision occurred within U.S. waters.

**A.   Testimony of Cyril Richardson:**

The most factually detailed testimony concerning the location of the interception and the collision that followed is from Cyril Richardson. Mr. Richardson testified that the location of the intercept and the location of the accident occurred at 200-300 hundred feet due north of Flanagan

Island and within U.S. waters. (RT - 2/22/27, 26:19 - 27:2; 27:15 - 30:25).

Mr. Richardson has the most experience in the area east of St. John and around Flanagan Island, having fished and set traps in that area since his childhood. ("RT" - 2/22/27, 7:22 - 13:13; 27:24 - 30:25).

Mr. Richardson is a native of the area with a lifetime of knowledge, is intimately familiar with the relevant coastlines and its landmarks, and navigates the area on a regular basis. The Court heard from Cyril Richardson that he was born in St. Thomas, has been a commercial fisherman, and maintains a 100-ton U.S. Coast Guard Masters License that was issued to him on March 22, 2006. He has set fish traps in the relevant area since he was a child, which came out when the Court questioned Mr. Richardson. Mr. Richardson testified that he would set "blind traps" which are traps without buoys or markers and return one week later and locate the traps using visual triangulation of landmarks from surrounding islands. (RT - 2/22/27, 64:15-25; 65:1 - 67:8). Mr. Richardson testified that he is very familiar with the waters around where this incident occurred and based upon landmarks, lights from homes and the silhouettes of the islands is able to triangulate positions. Triangulating was often how he located his fish traps when there were no buoys on the surface. (RT - 2/22/27, 68:2-13)

Mr. Richardson returned to the area of the incident approximately one week later and used a handheld GPS to obtain coordinates of the location of the accident. (RT - 2/22/27, 61:6-13). Mr. Richardson explained how he was able to note the coordinates in response to questioning by the Court:

The Court    :    Mr. Richardson, given that the sea is a moving thing and there are waves and swells, how is it that you can tell with such precision that that was the location where you were at the time of the accident?

The Witness  :    That is the proximity – the proximal area where we were at the time of the accident. Again, because of how close we were, the features of the islands that I remember seeing at the night of the accident.

The Court    :    When you saw you close you were, how close you were –

The Witness  :    Within a couple hundred feet of the island.

- 6 -

The Court : Which island?

The Witness : Flanagan.

(RT - 2/22/27, 63:5-19).

Mr. Richardson testified that BVI Customs vessel tied up Guilt Trip. While the vessels were tied up, Mr. Richardson testified that he saw waves breaking off the reefs surrounding Flanagan Island. Approximately 5 to 10 seconds after seeing the waves breaking off the reefs, the vessels were untied. The collision occurred within 30 seconds to one minute later. (RT - 2/22/17, 51:1 - 52:8; 52:15 - 53:2).

**B. Testimony of Meaghan Richardson:**

Ms. Richardson grew up in St. Thomas and has been boating her entire life and is very familiar with the waters where this incident occurred. (RT - 2/22/17, 95:16 - 97:8). Ms. Richardson testified that the interception occurred a couple hundred feet due north of Flanagan Island. (RT - 2/22/17, 98:18 - 100:18). Ms. Richardson testified that the vessels were tied up for approximately 10 minutes and that they were drifting within 300 feet of Flanagan Island to the point where she could see white water on the rocks. (RT - 2/22/17, 100:22 - 103:10).

Ms. Richardson testified that both the interception and the collision occurred in U.S. waters. (RT - 2/22/17, 104:12 -17).

**C. Testimony of Ryan Uzenski:**

Mr. Uzenski testified that the interception occurred within a couple hundred feet due north of Flanagan Island close enough that he was able to hear the ocean waves hitting the shore. (RT- 2/22/17, 110:13-23; 111:22-24). Mr. Uzenski estimated that his vessel was within a few hundred feet from Flanagan based on his being able to hear the waves and see the island in the dark. (RT - 2/22/17, 115:4 -13).[2]

---

[2] On cross-examination, Attorney Hodge dwelled on a prior statement in which Mr. Uzenski stated that "five minutes or so later, while I was talking to Pole, I saw a boat coming from the corner of my eye." Mr. Uzenski explained to Attorney Hodge that the five minutes was a combination of the time when Officer Pole came onto Guilt Trip, the time Officer Pole familiarized himself with the controls on Guilt Trip and the time the vessel was idling. (RT - 2/22/17, 126:25 - 128:3). Mr.

(continued...)

### D. Testimony of William Hudson:

To aide the Court in understanding the location of the US/BVI border, the Court called U.S. Marine Interdiction Agent William Hudson. Mr. Hudson produced Exhibit 20, which was the official NOAA chart relied upon by the Customs and Border Patrol as to the location of the international border. The Court provided certain coordinates to Agent Hudson and requested that Agent Hudson plot the coordinates on Exhibit 20. The coordinates did not specify as to whether they were in tenths or seconds, so Agent Hudson plotted both coordinates. (RT - 2/27/17, 52:4-11). Both sets of coordinates were within U.S. waters. (RT - 2/27/17, 54:15-20). Even if the vessels drifted approximately 500 feet after the intercept, they *still* would have been in U.S. waters. This can be confirmed by a review of Exhibit 20.

## VI.

### **DEFENDANT'S HAVE FAILED TO MEET THEIR BURDEN OF PERSUASION**

In determining whether immunity exits, it is the foreign state that has the ultimate burden to persuade the trier of fact. This is a steep burden, since once the burden shifts to the foreign state, the foreign state has to produce the greater weight of evidence to meet its burden. If after the foreign state presents its case, the Court were to find that the evidence on both sides was equally convincing so that the evidence presented by the foreign state did not preponderate to either side, then the BVI would lose since it would not have met its burden of proof

### A. Officer Randy Donovan:

Officer Randy Donovan testified that the Guilt Trip was intercepted approximately half a mile from The Bite. (RT - 2/27/17, 11:10-12). Officer Donovan testified that the vessel he was operating, Searcher 2, had a GPS chart plotter. While the tracking was turned off so that a historical account of the location was not maintained, the GPS chart plotter had a screen which would show in real time

---

[2](...continued)
Uzenski testified that Guilt Trip was only under way from Flanagan to the point of the collision for less than 1 minute and had traveled no more than a few hundred feet. (RT - 2/22/17, 122:25 - 123:6; 144:13 - 146:7). .

the exact location of the vessel. The Searcher 2 also had radar which would show the location and outlines of the structures, such as outlines. At no time did Officer Donovan view the screen to confirm the coordinates or the specific location of islands. (RT - 2/27/17, 23:11 - 25:10). Officer Donovan admitted that there is an ability to mark a specific location, either with a way point or man-over-board function, but that this was not done. (RT - 2/27/17, 28:17 - 30:17)

Officer Donovan was at a complete loss as to the distances from the east end of St. John to Flanagan Island, the distance from the east end of St. John to The Bite, the distance from the east end of St. John to the international border, the distance from The Bite to the international border or the distance from The Indians to the international border. (RT - 2/27/17, 27:21 - 28:11). Officer Donovan confirmed that it was dark with no moonlight. (RT - 2/27/17, 42:17-21). There were numerous ways for the Officer Donovan to determine the vessels' location, none of which were relied on. The evidence presented by Officer Donovan as to the location of the intercept and the location of the accident is not reliable. (RT - 2/27/17, 25: 9-11).

Officer Donovan did confirm that between the time the vessels separated and the collision occurred "it probably wasn't even a minute, a minute and a half, before it had the collision" and that the his vessel had traveled "maybe 500 feet." (RT - 2/27/17, 41:1-8).

**B.  Officer Osbert Pole:**

Officer Osbert Pole was assigned to the Searcher 2 on December 1, 2007 and the vessel was "hanging off the edge of Little Thatch, the western edge of Little Thatch." Officer Pole testified that they saw a vessel coming through the Narrows and headed in an easterly direction along St. John and they decided to follow the vessel. (RT - 2/27/17, 64:3-18). The vessel continued past the eastern tip of St. John. Officer Pole testified that "[w]e waited till the vessel entered BVI waters, and then we stopped the vessel by using the blue light and a search, a bright searchlight." (RT - 2/27/17, 65:5-9"). Officer Pole testified that he knew his location was in the BVI because The Indians were to his left and he could see the lights of Roadtown. (RT - 2/27/17, 65:14 - 66:18)

Officer Pole's testimony was based on his visual perceptions in the dark of night, yet it was a dark and moonless night. (RT - 2/27/17, 77: 22-25). Officer Pole was asked how he was able to determine precisely his nautical location by looking at land masses when it was a dark night. Officer

- 9 -

Pole responded "[o]n a dark night, you wouldn't be able to tell without looking at the GPS exactly your specific location. But you can still tell your approximate location." (RT - 2/27/17, 78:16-22). Officer Pole was asked "You would agree with me that on a dark night it would be difficult to determine the difference between a quarter mile and a half mile, unless there was some type of point of reference, correct?" Mr. Pole responded, "Correct." (RT - 2/27/17, 79:2-6).

### C.  Anantharaman Balasubramanian:

Anantharaman Balasubramanian ("Bala") is employed by the BVI Government as the acting director of shipping, which is part of the maritime administration of the Government of the BVI. Mr. Bala authenticated Exhibit 28, which is the British Admiralty Chart Number 2005 depicting the international border between the US and BVI.

Mr. Bala has no percipient knowledge as to the location of the intercept or the location of the collision. He was provided documents from the Attorney General's office depicting certain coordinates and, based on that information, Mr. Bala plotted the coordinates on Exhibit 28. The document that Mr. Bala used to plot the coordinates was dated February 1, 2008, *two months after the incident*. No documentation was provided to Mr. Bala, nor was any documentation introduced, that would establish the coordinates plotted by Mr. Bala closer in time than two months after the incident. (RT - 2/27/17, 129:1 - 139:8).

Using the document from two months after the accident, Mr. Bala plotted Point "A", which is approximately ½ mile from The Bite. (RT - 2/27/17, 118:6-16). Mr. Bala also plotted Point "B" which was based on a "reconstruction from the evidence given by the Customs officers." (RT - 2/27/17, 119:7-22). Mr. Bala testified that he was *not* provided any specific coordinates for Point B. (RT - 2/27/17, 119:18:22).

Mr. Bala testified that the information from the Customs officers was not from the night of the incident, but was taken the next day. (RT - 2/27/17, 126:9-15). However, the BVI did not produce, or was there ever any testimony, that the "coordinates" which were taken the next day were transcribed or otherwise recorded. There was no testimony as to how the BVI even determined the specific "coordinates" that Mr. Bala relied on. The evidence was uncontroverted that the first time the coordinates were recorded or documented was *two months after* the incident.

Mr. Bala's testimony and plotting on Exhibit 28 should be excluded under Fed.R.Evid. 702(b) because the testimony is not based on sufficient facts and 702(c) since it is not the product of reliable principles and methods. Mr. Bala had no concurrent data necessary to plot these points from either the night of the incident or the next day when the Customs officers purportedly went out to the area. The first documented evidence of Points "A" and "B" is from two months after the incident. Nautical coordinates documented two months after an incident cannot be used to establish a precise location two months earlier without some electronic or written documentation. At best, the coordinates represent an imaginary point placed on a chart two months after the incident.

Nor can the testimony of Officers Donovan or Pole provide any assistance. Officer Donovan was at a loss to testify as to distances. Office Pole answered without a GPS, he would not be able to plot a precise location. It was a dark and moonless night. Neither Officer Donovan nor Pole testified with reasonable precision to support a precise location as to the location of the interception and collision. Their testimony was general at best. Both agreed that the international border is an imaginary line between the eastern end of St. John and Norman Island.

**D.  BVI Witnesses re Plea and Conviction:**

The remaining BVI witnesses testified as to the guilty pleas and the conviction. Plaintiffs interposed objections on the basis of relevance to the location of the incident. The Court has taken the objections under advisement.

**VII.**

**INTERNATIONAL COMITY DOES NOT MANDATE THE GUILTY PLEAS HAVE A PRECLUSIVE EFFECT ON THE ISSUE OF WHERE THE ACCIDENT OCCURRED**

In determining whether to acknowledge a foreign judgment, the Court applies the doctrine of comity, or a doctrine of deference based on respect for the judicial decisions of foreign sovereigns. *Hilton v. Guyet* (1895) 159 U.S. 113, 163. A court may take judicial notice of a foreign judgment. *Id.* at 205-206. A party's guilty plea in a criminal action is not conclusive in a subsequent civil actions, but it may be admitted as an evidentiary admission under Federal Rule of Evidence 801(d)(2)(A) that a party may attempt to explain away. *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.* 49 F.3d 399, 403 (8th Cir. 1995). See also *Anela v. City of Wildwood* 790 F.2d 1063, 1068 (3rd

- 11 -

Cir. 1986) in which the Third Circuit discussed the lower court's qualification that a guilty plea may not be conclusive in a subsequent pleading because "one may plead guilty for reasons of conveniences rather than guilt" but " by so doing one necessarily imperils his right to later claim innocence."

Defendant argued at the evidentiary hearing that the District Court should recognize Plaintiffs' criminal convictions in the British Virgin Islands under the doctrine of international comity even though (1) there is no a *nolo contendre* plea available in the BVI system, (2) the guilty pleas and convictions do not contain a factual basis or an acknowledgment as to the factual basis, and (3) Plaintiffs were suffering from severe injuries and the pleas were made to be released in order to seek medical treatment in the US.

Plaintiffs do not dispute the guilty pleas. The issue is not the Court's recognition of the guilty pleas but rather what effect the guilty pleas have on the issue of where the accident occurred. Defendant argues the guilty pleas conclusively show that the accident occurred in BVI waters. The doctrine of international comity does not require this. Defendant confuses the doctrines of international comity and issue preclusion. They are not the same and meeting the requirements of one does not mandate application of the other.

## VIII.

## THE DECISION TO DEFER TO A FOREIGN JUDGMENT IS WITHIN THE SOUND DISCRETION OF THE TRIAL JUDGE

Even if the court were to accept Defendant's argument that recognition of a foreign judgment requires preclusion on the issue of where the accident occurred, the court is not required to recognize a foreign judgment.

The United States Supreme Court has required certain criteria be satisfied before a court of the United States recognizes a foreign nation's judgment:

> [W]e are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of defendant, and under a system of jurisprudence likely to secure an impartial administration of justice ..., and

- 12 -

there is nothing to show either prejudice in the court, ... or fraud in procuring the judgment ... the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal....

Hilton v. Guyot, 159 U.S. at 202-203.

While the comity doctrine does not reach the force of obligation, it creates a strong presumption in favor of recognizing foreign judicial decrees. *U.S. ex rel. Saroop v. Garcia* 109 F. 3d 165, 169 (3rd Cit. 1997) citing *Republic of Philippines v. Westinghouse Electric Corp.*, 43 F.3d 65, 75 (3d Cir.1994); *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir.1995). The decision to defer to a foreign judgment falls within the sound discretion of the trial judge and comity should be avoided only when it would be detrimental or prejudicial to the interests of the United States. *Id.*

Pursuant to *Saroop*, the Court is not required to accept the guilty pleas. Defendant argues there is no prejudicial effect to the interests of the United States if the court were to accept the guilty pleas and criminal convictions. However, Plaintiffs would suffer prejudice if the Court were to accept Defendant's position that recognition of the guilty pleas precludes taking evidence on where the intercept and the collision occurred.

Plaintiffs are United States citizens who were injured by the negligence of a foreign government. The United States has a strong interest in protecting its citizens in situations just like here. If Plaintiffs cannot put on evidence that the accident occurred in U.S. waters, they cannot assert a claim against the British Virgin Islands government under the Foreign Sovereign Immunities Act.

## IX.

## **THE GUILTY PLEAS DO NOT HAVE A PRECLUSIVE EFFECT**

Even if the Court were to recognize the guilty pleas, the Third Circuit has specifically held that guilty pleas do not collaterally estop a defendant who pled guilty from litigating issues that would have been litigated if the defendant went to trial. *Bower v. O'Hara* 759 F.2d 1117, 1125-1126 (3rd Cir. 1985).

*Bower v. O'Hara* is instructive in this case. In *Bower,* the defendant stabbed the plaintiff in a bar fight. *Id.* at 1120. Criminal charges were filed and the defendant pled guilty to third-degree assault. *Id.* The plaintiff then brought suit against defendant for injuries sustained in the stabbing.

*Id.* Defendant attempted to assert the defense of self-defense but plaintiff protested that the prior guilty plea estopped defendant from asserting such a defense. As a result, summary judgment was granted for the plaintiff. *Id.* On appeal, the Third Circuit reversed holding that defendant could assert self-defense because this issue had not been actually litigated in the criminal trial. *Id.*

Relying on the Restatement (Second) of Judgements, the Third Circuit held that in such cases, guilty pleas present a matter of the law of evidence and not issue preclusion:

> A defendant who pleads guilty may be held to be estopped in subsequent civil litigation from contesting facts representing the elements of the offense. However, under the terms of the Restatement such an estoppel is not a matter of issue preclusion, because the issue has not actually been litigated, but is a matter of law of evidence beyond the scope of this Restatement.

*Bower* at 1126.

The issue of where Plaintiffs were pulled over and arrested was not previously litigated because Plaintiffs pled guilty. More importantly, the guilty pleas do not address the location of the accident. Under *Bower*, Plaintiffs are not precluded from relitigating this issue.

Defendant's discussion of *Anderson v. C.I.R* 698 F.3d 160 (3d Cir.2012) is incomplete. In *Anderson*, unlike the present case, the same exact issue was being litigated in both forums. In *Anderson*, the defendant pled guilty to criminal tax evasion. *Id.* at 162. The United States Tax Court brought a civil tax fraud action against defendant and argued that under collateral estoppel, his previous guilty plea for criminal tax evasion conclusively established the taxability of him to specific income that his criminal indictment charged him with failing to report. *Id.* Applying the same elements of collateral estoppel listed in *Bower* (though not citing to *Bower* specifically), the court found because the elements for a criminal conviction for tax evasion under 26 U.S.C. §7201 and fraud under 26 U.S.C. §6663 were identical, the guilty plea had a preclusive effect in the present action. *Id.* at 164. The issues in the actions were the same, they were previously litigated and determined by a final and valid judgment (i.e. guilty plea), and the determination was essential to the prior judgment. *Id.* Where a conviction is the result of a guilty plea, its preclusive effect extends

to all issues that are necessarily admitted in the plea. *Id.*

The reason why *Anderson* is inapposite is that different issues are being litigated here. The issue litigated in the BVI case was entering the BVI without leave of a customs official. The issue to be litigated in the present case is where the injury causing event occurred - US or BVI waters.

Under *Bower,* Plaintiffs' guilty pleas at most present a factual dispute as to where the accident occurred. They are not conclusive on the issue because the location of the accident was not previously litigated. There was no adversarial hearing in which the BVI presented evidence of where or when the accident occurred. The BVI merely assumes that a guilty plea is dispositive of the location of the vessel at the time the Plaintiffs were injured. This ignores the likelihood that the pleas may have been made for reasons wholly unrelated to the location of the vessel at the time of the injury. It also ignores the fact that the guilty pleas do not address where or when the conduct that caused injury to the Richardsons occurred.

This case also differs from *Anderson* because the elements for illegal entry into the BVI waters are not the same as the elements for Plaintiffs' claim or what is required to overcome immunity under the FSIA. The preclusive effect, if any, of the Plaintiffs' guilty pleas only extends to the issues admitted in the plea. *Anderson* at 164. Here, all that Plaintiffs' pled guilty to is entering the BVI waters at some point without prior leave of an immigration officer. This is not an admission that the accident occurred in U.S. waters.

## X.

## BVI FAILED TO MEET ITS BURDEN

Once Plaintiffs met their burden of coming forward with "at least some facts that would establish the exception," then Defendant has the ultimate burden of proof to show that the exception does not apply. *Stena Rederi AB v. Comision De Contratos Del Comite, supra,* 923 F.2d at 390, fn. ["[T]he party seeking immunity bears the ultimate burden of proving the nonapplicability of the exceptions raised by its opponent"]. Plaintiffs did much more than come forward with "at least some facts" that the accident occurred in U.S. waters. If the Court concludes that neither side proved the location by a preponderance of the evidence, Plaintiffs still prevail since Defendant has the ultimate

- 15 -

1  burden of persuasion.[3] *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 (3d Cir. 1993).

2  If the Defendant shows that it is a foreign state, the Defendant presumptively has immunity.

3  *Id*. The burden then shifts to the Plaintiff to produce some evidence that an exception under the FSIA

4  applies. However, the ultimate burden of proving immunity from suit lies with the foreign state. *Id*.

5  The ultimate burden of persuasion lies with the foreign state. *City of New York v. Permanent Mission*

6  *of India to the United Nations*, 446 F.3d 365, 369 (2d Cir.2006).

7  The Plaintiffs' burden is only one of *production*. The ultimate burden of proving immunity,

8  however, rests with the foreign state. *Abdulla v. Embassy of Iraq,* 2013 U.S. Dist. LEXIS 127914*,

9  *7 (E. Dist of Penn. 2013); *Fed. Ins. Co. v. Richard I. Rubin & Co., supra*, 12 F.3d at 1285 & fn.

10  13 (citing H.R. Rep. No. 94-1487, at 17 (1976). If a plaintiff satisfies his or her burden of

11  production, "jurisdiction exists unless the defendant demonstrates by a preponderance of the

12  evidence that the claimed exception does not apply." *Abdulla v. Embassy of Iraq,* 2013 U.S. Dist.

13  LEXIS at *8; *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117, 1125 (9th Cir. 2010).

## XI.

## CONCLUSION

16  Through the testimony of witnesses and nautical charts, Plaintiffs have established "some

---

[3] During closing argument at the Evidentiary Hearing, the following colloquy occurred between the Court and counsel for Plaintiffs concerning the weight of the evidence presented by both sides:

> The Court: I'm going to give you a chance to argue this, but I'm just saying for the sake of argument, assuming they [i.e. the weight of the evidence] are in equal balance, if they're in equal balance, who wins? Do you win?
>
> Mr. Friedberg: No. Unfortunately, no, we don't, Your Honor.

(Reporter's Transcript of 2-27-2017 at p. 157, lines 9-15).

Attorney Friedberg's response to the Court was *incorrect.* The case law establishes that after Plaintiffs produce "some facts" as to the location of the accident being within U.S. waters., then the burden shifts to Defendant. If the weight of the evidence is in equal balance on both sides, it is Defendant that has then failed to meet its burden of proof and will not have immunity from suit.

facts" as to the location where the intercept between the vessels occurred and the location of the collision. While the evidence produced by the BVI is in conflict with Plaintiffs' facts as to the location of the interception and collision, this is not enough. Defendant has the ultimate burden of persuasion. Defendant's evidence through the testimony of Custom officers Donovan and Poole is not enough. Their testimony was vague and, by their own admissions, it was too dark for them to be able to precisely identify their location. Of course, they had the means to determine their specific location had they just looked at the chart plotter, which they failed to do.

The Court's determination as to the location must be in favor of Plaintiffs' since Defendant has not ultimately met their burden of persuasion. Evidence of a conflict in the location does not preponderate one way or another as to which evidence is more likely. If the evidence is evenly balanced, it cannot preponderate and the party with the ultimate burden of persuasion must lose.

For the forgoing reasons, and based upon the evidence presented, the Court's ruling should be in favor of exercising jurisdiction.

Dated : March 30, 2017					**LAW OFFICES OF FRIEDBERG & BUNGE**

By: *s/ THOMAS F. FRIEDBERG, ESQ.*
THOMAS F. FRIEDBERG, ESQ. (VI # 1006)
Attorneys for Plaintiffs, MEAGHAN RICHARDSON, CYRIL RICHARDSON
610 West Ash Street, Suite 1400
P.O. Box 6814
San Diego, California 92166-0814
TEL : (619)557-0101
FAX: (619)557-0560
"tom@lawofficefb.com"

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and exact copy of the foregoing **PLAINTIFFS' POST EVIDENTIARY HEARING BRIEF** was served on March 30, 2017, by causing this document to be e-mailed to the following parties and counsel:

Maria Tankenson Hodge, Esq.
Mark Hodge, Esq.
**HODGE & HODGE**
1340 Taarneberg
St. Thomas, V.I.  00802
TEL 340-774-6845
FAX: 340-714-1848
maria@hodgelawvi.com
mhodge@hodgelawvi.com

*s/THOMAS F. FRIEDBERG, ESQ.*
Attorneys for Plaintiffs, MEAGHAN RICHARDSON and CYRIL RICHARDSON